UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

JAMES MATTORANO PINEDA,

                Defendant.

Case No. 3:22-cr-00016-MMD-CSD-1

ORDER

## I.  SUMMARY

James Mattorano Pineda is charged with felon in possession of a firearm and possession of an unregistered firearm based on a gun that Nevada Highway Patrol ("NHP") troopers discovered during an inventory search. (ECF No. 9.) The gun was found in the front passenger floorboard of a car where Pineda was a passenger. Before the Court is Pineda's motion to suppress the gun and incriminating statements from the stop and search. (ECF No. 31 ("Motion")).[1] The Court held an evidentiary hearing on the Motion on April 24, 2023 ("Hearing"), and considers the arguments raised and exhibits admitted therein. (ECF Nos. 54; 55.) Because Trooper Koester had reasonable suspicion to stop the vehicle and the gun was the "fruit" of a constitutional traffic stop, the Court will decline to suppress the gun. Because Trooper Koester's actions did not convert the stop into an arrest, and even if there was an illegal arrest, the incriminating statements would still be admissible under the attenuation doctrine, the Court will also decline to suppress the incriminating statements. The Court will therefore deny the Motion (ECF No. 31).

---

[1]The government filed a response to the Motion (ECF No. 39), and Pineda filed a reply (ECF No. 45). The Court also granted leave for the filing of supplemental authorities. (ECF Nos. 56; 57; 59.)

## II.    FACTUAL FINDINGS

The Court relies on evidence attached to the parties' briefs, as well as the testimony presented at the Hearing, to make its findings of fact.

According to the Reno Police Department ("RPD") CAD Report and RPD Officer Derek Jones's own testimony,[2] Officer Jones observed an early 2000s Jeep Cherokee that was parked at Motel 6 on North Wells Avenue in Reno in the early morning of February 4, 2022. (ECF Nos. 45 at 2; 45-1 at 2; 54.) The Jeep had a Nebraska license plate. (ECF No. 54.) Officer Jones thought the vehicle might have been stolen because he previously found many stolen vehicles in that Motel 6 parking lot and because the license plate check came back for a Honda, not a Jeep. (*Id.*) However, Officer Jones told dispatch that he was investigating for a "10-99" stolen vehicle, rather than a possible stolen vehicle. (ECF Nos. 45-1 at 2; 54.)

Officer Jones surveilled the vehicle for approximately two hours before he was joined by another RPD officer. (ECF No. 54.) When the Jeep eventually started moving and got onto the freeway at a high speed, approximately three RPD cars began following the Jeep. (ECF Nos. 45 at 2; 45-1 at 2; 54.) Officer Jones does not recall activating his lights and sirens. (ECF No. 54.) The RPD CAD report described the driver as a Hispanic female wearing a red-hooded sweatshirt, with a dog in the back. (ECF No. 45-1 at 2.) RPD eventually stopped following the vehicle pursuant to department policy. (ECF Nos. 45-1 at 2; 54.)

Shortly afterwards, Trooper Koester of the NHP received an "attempt to locate" dispatch while on patrol in Sparks that RPD was recently in pursuit of a vehicle that fled

---

[2]During the Hearing, the government objected to Jones's testimony and the introduction of the RPD CAD Report on the basis of relevance. (ECF No. 54.) The Court overruled the objection. (*Id.*) The CAD Report and Jones's testimony are relevant because they clarify the accuracy of the dispatch report to Trooper Koester. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action").

from a traffic stop.[3] (ECF Nos. 39-3 at 2; 54.) Specifically, dispatch reported that a stolen vehicle, with a fictitious Oregon license plate number 77B775, fled from RPD after RPD tried to stop the car. (ECF No. 39-3 at 2.) Dispatch described the car as a maroon, early 2000s Jeep Cherokee driven by a Hispanic female wearing a red hooded sweater, with a dog in the back. (ECF Nos. 31 at 2; 39 at 2-3; 39-3 at 2.) Soon after receiving the dispatch, Trooper Koester spotted a red Jeep with the same license plate number and a driver matching the description and began following the vehicle. (ECF Nos. 31 at 2; 39 at 3; 39-2 at 10; 54.) However, he noticed that the car had a Nebraska, not Oregon, license plate bearing the number from the dispatch report. (ECF Nos. 39 at 3; 39-2 at 10.) Trooper Koester ran the license plate number, and the check returned as a "no match" or an error. (ECF Nos. 39-3 at 2; 54.)

The Jeep then abruptly pulled into a Mor Furniture parking lot.[4] (ECF Nos. 31 at 2; 41-3 at 9:55:48; 54.)[5] Trooper Koester turned on his front-facing lights, briefly activated his sirens, and exited his patrol car. (ECF Nos. 39 at 3; 41-3 at 9:55:56.) Trooper Koester testified that he activated his lights and sirens to announce his presence and that the traffic stop was happening. (ECF No. 54.) Within seconds of the Jeep stopping, Pineda, the male passenger, exited the passenger side of the car and started walking towards the rear of the Jeep. (ECF Nos. 41-3 at 9:56:04; 54.) Trooper Koester drew his service pistol, ordered Pineda to stop where he was, show him his hands, show him his waistband, and

---

[3]The Court notes that there is a brief lag in audio at the beginning of Trooper Koester's dashcam. (ECF No. 41-3.) Trooper Koester testified that there was a 30 second buffer after the video was activated. (ECF No. 54.)

[4]Trooper Koester testified that he did not initiate a traffic stop before then because he had information the Jeep was stolen and had fled from RPD's pursuit, so he was waiting for back-up to arrive. But when the Jeep abruptly pulled into the Mor Furniture parking lot, he had to initiate the stop knowing that other troopers were approaching. (ECF No. 54.)

[5]The Court uses the time stamp at the upper right corner of the body camera. (ECF No. 41-3.) Trooper Koester's bodycam footage was submitted as Government's Manually Filed Exhibit 3. (*Id.*)

spin around. (ECF Nos. 41-3 at 9:56:27-9:57:07; 54.) Pineda complied with Trooper Koester's orders. (ECF No. 54.)

Trooper Koester then informed dispatch that he was doing a felony stop, told dispatch that the car was a red Jeep with a Nebraska plate, and asked dispatch to run the plates again. (ECF Nos. 41-3 at 9:57:19-9:58:00; 54.) Trooper Koester asked Pineda if he had any other passengers in the car, and Pineda replied that he just had his dog. (ECF No. 41-3 at 9:59:18.) Pineda and the driver of the Jeep, Yolanda Flores-Escobedo, were held at gun point by Trooper Koester, the sole officer on the scene, until back up Troopers Clow and Stuke arrived to assist. (ECF Nos. 39-2 at 10; 54.) Trooper Koester testified that in a high-risk felony traffic stop, NHP protocol requires all occupants of the vehicle to be taken out at gun point, and for the troopers to clear the vehicle. (ECF No. 54.)

When back up arrived, Trooper Koester ordered Pineda to reverse to Trooper Chow and get on his knees, and Trooper Clow placed Pineda in handcuffs, frisked him for weapons, and put Pineda in the back of Trooper Koester's patrol car. (ECF Nos. 39-2 at 10; 54.) Flores-Escobedo was also handcuffed and placed in the back of Trooper Clow's patrol car. (*Id*.) Trooper Koester observed a large Pit bull in the car; the Pit bull's head was sticking out of the fully rolled down windows. (ECF Nos. 41-3 at 10:02:00; 54.) Pineda called out to troopers to make sure that his dog does not jump out of the window because his dog is "kind of dumb." (ECF No. 41-7 at 5:58.)

Pineda assured Trooper Koester that the dog was friendly, but the dog was freaked out by uniforms because the mailman tried to attack him. (ECF No. 41-3 at 10:01:13.) Trooper Koester asked for animal control to come to the scene because there was a "hostile Pit bull" in the car, and they were trying to clear the car. (*Id*. at 10:01:18-10:01:39.) Pineda told Trooper Koester that his dog was not hostile, and that Trooper Koester could go up to the window of the car if he said "hey boy" to the dog. (*Id*. at 10:01:29.) Trooper Koester followed Pineda's advice, approached the car, and verified that no one else was inside the car. (*Id*. at 10:02:36-10:03:57.) He also received information from dispatch that

4

the Jeep's plates belonged to a 2001 Honda Accord, confirming that they were fictitious. (ECF Nos. 31-1 at 10; 54.)

Trooper Stuke tried to safely get the VIN number of the car under the windshield to ascertain the vehicle's registration status and verify whether the vehicle was stolen. (ECF No. 41-6 at 10:04:44.) However, when he approached the vehicle, the dog growled at him, so the troopers delayed accessing the vehicle and getting the VIN number until the dog was secured by animal control. (ECF Nos. 41-3 at 10:05:08; 41-6 at 10:04:44.) Pineda offered to get the VIN number for the troopers, but Trooper Koester instructed him to sit tight. (ECF No. 41-3 at 10:04:50.) Dispatch informs Trooper Koester that RPD is now saying that the only charge they have is the fictitious plates. (*Id*. at 10:04:34.) Trooper Koester tells another officer that although he was originally told the Jeep was stolen, "I don't know if that's the case, fictitious plates on it for sure, but can't get the VIN just yet because the dog is growling." (*Id*. at 10:04:59.) Trooper Koester testified that he did not terminate Pineda's detention at that point and continued investigating because he was receiving conflicting information and wanted to confirm whether the vehicle was stolen. (ECF No. 54.) Pineda tells Trooper Koester that, although his dog is super nice, the guns freak him out. (ECF No. 41-3 at 10:05:34.)

While waiting for animal control to arrive, Trooper Koester asked for Pineda's name, date of birth, and social security number, which Pineda immediately provided, and Pineda also volunteered that he was on parole in Nevada and gave Trooper Koester the name of his parole officer. (*Id*. at 10:05:49-10:06:26.) Trooper Koester testified that it is often standard practice to ask passengers for their identification during a traffic stop, particularly when there was suspicion of other crimes being committed. (ECF No. 54.) Pineda told Trooper Koester that he did not want his dog to get shot and Trooper Koester reassured Pineda that the dog was okay, and they are waiting for animal control to arrive to get the car's VIN. (ECF No. 41-3 at 10:06:30-10:06:37.) Trooper Koester asked dispatch to check if Pineda had any warrants. (ECF Nos. 41-3 at 10:07:03; 54.) Dispatch informed him that there was a DONS Priority 5 automatic hold and parole warrant on

Pineda. (ECF Nos. 31-1 at 11; 41-3 at 10:07:57.) Trooper Koester asked dispatch to contact Pineda's parole officer, C. Congdon. (ECF Nos. 41-3 at 10:09:34; 54.)

Trooper Stuke then told Trooper Koester that he saw three RPD cars "all over," with their sirens on, pursuing the Jeep. (ECF No. 41-3 at 10:11:25-10:11:38, 10:14:17-10:14:44.) Dispatch advised Trooper Koester that Pineda's parole officer is off duty; Trooper Koester informed Pineda about the active warrant and asked Pineda if he knew he had a warrant. (*Id*. at 10:12:21-10:13:09.) Pineda appears surprised at this information, and Trooper Koester informs Pineda that "they want you" and he is trying to get a hold of Pineda's parole officer to find out the reason why. (*Id*. at 10:13:14-10:13:25.) Trooper Koester testified that, in his mind, Pineda was arrested at that point. (ECF No. 54.) Pineda expresses concerns, again, that his dog might get accidentally shot if the dog runs out of the car. (ECF No. 41-3 at 10:13:52.)

When animal control finally arrived, over 20 minutes after the Jeep was pulled over, the animal control officer determined that the safest way to secure the Pit bull was for Pineda or Flores-Escobedo to personally remove the dog from the car. (*Id*. at 10:17:48-10:18:30.) While the troopers decided whether to temporarily release Pineda to remove his dog, an officer asked Pineda whether he had any weapons in the car. (*Id*. at 10:21:45.) Pineda responded no, but there might be a knife in his black backpack. (*Id*. at 10:21:50.) The troopers temporarily released Pineda from his restraints, Pineda removed the dog from the Jeep, and the troopers placed him back in handcuffs. (*Id*. at 10:22:40-10:24:16.)

Once the dog was removed, the troopers were finally able to access the vehicle and run the Jeep's VIN number. (*Id*. at 10:25:45.) The VIN number confirmed that the vehicle was not stolen but had fictitious plates and was registered to a third party, Christina Clements. (ECF Nos. 31-1 at 12; 41-3 at 10:35:11; 54.) The troopers decided to tow the Jeep because the car was registered to a third party, the plates affixed to the car were fictitious, and the driver of the vehicle could not provide the troopers with any documentation that she was in lawful possession of the vehicle. (ECF Nos. 39-9 at 2; 54.)

The troopers then conducted an inventory search and completed an inventory sheet. (ECF Nos. 31 at 4-5; 39 at 7; 39-9 at 2.) During the inventory search, Trooper Stuke found a gun bag in the front passenger floorboard where Pineda was sitting. (ECF Nos. 31 at 5; 39 at 7; 41-6 at 10:29:53.) Trooper Stuke brought the black bag to Pineda and asked him if this was the same black backpack that Pineda referenced before; Pineda replied no, his black backpack was in the backseat. (ECF Nos. 41-3 at 10:32:22-10:32:32; 41-6 at 10:32:26.) Acting Sergeant Thompson also found a machete in the car. (ECF No. 41-3 at 10:33:12.) Trooper Stuke subsequently opened the gun bag and discovered a loaded sawed-off shotgun inside. (ECF Nos. 41-3 at 10:39:53; 41-6 at 10:39:28-10:39:58.) Trooper Koester unloaded the shotgun and placed it in the back of his patrol car. (ECF No. 43 at 10:40:59-10:42:31.)

Trooper Koester returned to Pineda and informed him that he was under arrest for the priority 5 probation warrant. (*Id*. at 10:43:23.) He gave Pineda his *Miranda* warnings and Pineda indicated that he understood his rights. (*Id*. at 10:43:39.) Trooper Koester proceeded to question Pineda about the shotgun. (*Id*. at 10:43:53.) While Pineda initially said, "no comment," he immediately denied that the gun was Flores-Escobedo's when Trooper Koester asked if the gun was hers. (ECF Nos. 41-3 at 10:43:52; 54.) Pineda then admitted that the gun belonged to him, that he modified the gun, and that he just got the gun. (ECF Nos. 41-3 at 10:44:17; 54.) Trooper Koester informed Pineda that he was now under arrest for the parole warrant and for possession of the shotgun. (ECF No. 41-3 at 10:44:47-10:44:51.) Flores-Escobedo was released with a citation for driving with fictitious plates. (ECF Nos. 41-3 at 10:45:30-10:53:06; 54.)

Trooper Koester listed Pineda's charges in the booking sheet, but later crossed out "arrest for violation of parole" and "possession of a dangerous weapon" at the request of the clerk, who told him to add "PNP hold" in the left corner of the booking sheet instead. (ECF No. 54.) Trooper Koester later spoke to the daughter of the Jeep's registered owner, Tatianna Leilani Gutierrez, who informed him that Flores-Escobedo was her best friend,

that she did not realize Flores-Escobedo and Pineda had the Jeep, and that they did not have permission to have the vehicle. (ECF Nos. 31-1 at 12; 54.)

## III.   DISCUSSION

Pineda argues that the discovery of the gun and his incriminating statements were both results of an unlawful stop and search, in violation of his Fourth Amendment rights, and should be suppressed. (ECF No. 31 at 11.) Pineda presents three distinct arguments for suppression of the evidence: (1) his seizure was an arrest from the inception because of the level of force used, (2) his arrest was not supported by probable cause because the vehicle was not stolen and Trooper Koester acted on inaccurate information, and (3) there was no basis for the inventory search and tow. (*Id*. at 6-11.)

The Court declines to suppress the gun because the traffic stop was constitutional, and the gun was the "fruit" of the valid traffic stop. The Court also declines to suppress Pineda's incriminating statements because the traffic stop was not unlawfully prolonged and law enforcement's actions did not convert the investigatory stop and detention into an arrest. Moreover, even if Pineda's seizure was an illegal arrest, his incriminating statements would still be admissible under the attenuation doctrine. Therefore, the Court will deny Pineda's Motion.

### A.   Pineda's Standing

As a preliminary matter, the government argues that Pineda lacks standing to directly challenge the search of the Jeep. (ECF No. 39 at 8.) The Court agrees because, as a passenger of the vehicle, Pineda does not have a possessory interest in the car. *See U.S. v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005) (explaining that a passenger with no possessory interest in the car "has no reasonable expectation of privacy in a car that would permit [his] Fourth Amendment challenge to a search of the car") (citations and quotation marks omitted). However, Pineda does have standing "to contest the legality of his own detention" and can show that the discovered contraband is "in some sense the product of his unlawful detention." *Id*. at 787 (citations and quotation marks omitted). Pineda also has standing to challenge the initial stop, the fruit of the unlawful stop, the

license plate check that prompted the stop, law enforcement's request for his identification, and law enforcement's subsequent check of his driver's license or ID card. *See U.S. v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000) (citations omitted); *U.S. v. Diaz-Castaneda*, 494 F.3d 1146, 1150 (9th Cir. 2007) (citations omitted).

## B.   Suppression of the Gun

The Court will first address suppression of the gun that the troopers found in the front passenger floorboard of the Jeep. (ECF Nos. 31 at 5; 39 at 7; 41-6 at 10:29:53.) Defense counsel conceded during the Hearing that the gun was the product of the fictitious plates. (ECF No. 54.) Pineda also maintained in his reply that law enforcement's decision to tow the Jeep was specifically the result of the fictitious plates, "not [his] arrest for being priority 5." (ECF No. 45 at 8.) But Pineda contends that law enforcement had no basis for towing the Jeep and conducting the inventory search, which led to the discovery of the gun. (ECF No. 31 at 9-10.) The Court disagrees and finds that the gun was the "fruit" of a valid stop under the Fourth Amendment and should not be suppressed.

"Traffic stops are seizures under the Fourth Amendment, so officers must have at least a reasonable suspicion of criminal misconduct before detaining a driver." *U.S. v. Rojas-Millan*, 234 F.3d 464, 468 (9th Cir. 2000) (citation omitted). Reasonable suspicion "is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Id*. at 468-69 (citation omitted). An officer may "rely on his training and experience in drawing inferences from the facts he observes," but "those inferences must also be grounded in objective facts and be capable of rational explanation." *Id*. at 469. "The requirement of *particularized* suspicion encompasses two elements." *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (citation omitted). "First, the assessment must be based upon the totality of the circumstances." *Id*. (citation omitted). "Second, that assessment must arouse a reasonable suspicion that the *particular person being stopped* has committed or is about to commit a crime." *Id*. (citations omitted).

The Court finds that Trooper Koester had reasonable suspicion for the traffic stop and the stop was constitutional. Trooper Koester pulled over the Jeep because dispatch initially reported that the Jeep was stolen, had fled from RPD officers during a stop, and had fictitious license plates. (ECF Nos. 39-3 at 2; 39-3 at 2; 54.) However, this information was partially inaccurate because it was later revealed that the Jeep was not stolen and had not fled from RPD. (ECF Nos. 39 at 7; 41-3 at 10:04:34, 10:35:11; 54.) But a mistaken fact does not automatically nullify the basis for reasonable suspicion.[6] A mistaken fact, when held "reasonably and in good faith, can provide reasonable suspicion for a traffic stop." *Twilley*, 222 F.3d at 1096 n.1 (citations omitted); *see also Liberal v. Estrada*, 632 F.3d 1064, 1077 (9th Cir. 2011) ("Even if an officer makes a mistake of fact, that mistake will not render a stop illegal, if the objective facts known to the officer gave rise to a reasonable suspicion that criminal activity was afoot") (citation omitted). Here, RPD Officer Jones initially conveyed to dispatch that he was investigating a "stolen" vehicle, dispatch then conveyed this information to Trooper Koester, who relied on the dispatcher's report in good faith, as there were no facts to suggest otherwise at the time of the stop.[7] (ECF Nos. 39-3 at 2; 45-2 at 2; 54.) Hence, although some of the information

---

[6]The government explicitly raised the mistake of fact issue in their supplement. (ECF No. 56.) Pineda was granted leave to respond and subsequently submitted his own supplement on this issue. (ECF Nos. 58; 59.)

[7]Pineda argued, for the first time in his reply, that the collective knowledge doctrine applies and RPD's knowledge that it was only investigating the car for fictitious plates should be imputed onto NHP. (ECF No. 45 at 4-5.) At the Hearing, the Court allowed the parties to supplement their arguments on the collective knowledge issue, and for Pineda to provide case law where this doctrine was used defensively. (ECF No. 54.) In the supplement, Pineda cited to a 1976 Ninth Circuit case, *U.S. v. Robinson*, where the Ninth Circuit held that "founded suspicion to stop defendant's vehicle could not be based *solely* upon the receipt by the stopping officer of a radio dispatch to stop the described vehicle without any proof of the factual foundation for the relayed message." 536 F.2d 1298, 1299 (9th Cir. 1976) (emphasis added). However, Trooper Koester's basis for reasonable suspicion was not solely derived from the dispatcher's report—the stop was also partially based on his personal observations and his suspicions that the car had fictitious plates— an indicator that it could be stolen. (ECF No. 54.) For instance, Trooper Koester ran the Jeep's license plates before the stop and it came back as "error" or "no match." (*Id.*)

Trooper Koester relied on was inaccurate, they will nonetheless provide reasonable suspicion for the felony stop. *See Twilley*, 222 F.3d at 1096 n.1; *Liberal*, 632 F.3d at 1077.

Moreover, the Jeep *did* have fictitious plates and Trooper Koester has sufficient reasonable suspicion to stop the Jeep on fictitious plates *alone*. (ECF No. 31-1 at 10.) Trooper Koester testified that he suspected the Jeep of having fictitious plates because he ran the license plate number *before* the stop, and the check returned as a "no match" or error. (ECF Nos. 39-3 at 2; 54.) The Ninth Circuit and lower courts have found that an officer's suspicion that a vehicle's plates are fictitious serves as reasonable suspicion for a traffic stop. *See Rojas-Millan*, 234 F.3d at 469 (finding that the trooper's "suspicion that [the defendant's] plates might be fictitious became a reasonable basis for a traffic stop once he ran two checks on the number, both of which came up 'no match'"); *U.S. v. Adame-Farias*, Case No. 98-10434, 1999 WL 451144, at *1 (9th Cir. 1999) (finding the traffic stop constitutional because the trooper "had a reasonable suspicion that the automobile was not properly registered" after noticing "an irregularity on the license plate," and after dispatch ran the license number twice and found no match); *Belcher-Bey v. City of Las Vegas*, Case Nos. 2:12-cv-01829-JAD-CWH, 2:12-cv-01909-JAD-CWH, 2015 WL 1344790, at *3 (D. Nev. Mar. 20, 2015) (finding that the officer "plainly had reasonable suspicion that Belcher-Bey was violating Nevada's traffic laws" because "the vehicle she was driving on public roads bore fictitious plates").

Because defense counsel conceded that the gun was a "fruit" or product of the fictitious plates and the Court finds that Trooper Koester had reasonable suspicion to stop the vehicle on fictitious plates, any evidence derived from the lawful stop would be admissible.[8] (ECF No. 54.) The troopers subsequently decided to tow the Jeep and

---

Because the cases are factually distinct, the Court rejects Pineda's argument and declines to apply the collective knowledge doctrine.

[8]Notably, defense counsel also admitted during the Hearing that there was likely reasonable suspicion for the stop. (ECF No. 54.)

conduct an inventory search,[9] in accordance with Nevada Department of Public Safety ("DPS") Policy, because two license plate checks confirmed the plates belonged to a different car model[10] and a VIN number check confirmed that the Jeep was registered to a third party—so the car could not be released to Pineda or the driver. (ECF Nos. 41-3 at 10:35:11; 54.) *See* DPS Policy 503.4.2(a) ("[v]ehicles which come under the control of the Department may be impounded at the involved officer's discretion" when "[t]he vehicle is not properly registered"); 503.5.4 ("[p]rior to towing, all property in a stored or impounded vehicle shall be inventoried and listed in the inventory section of the Vehicle Impound Report. This includes the trunk and any compartments or containers, even if closed . . . These inventory procedures are for the purpose of protecting an owner's property while in Department custody, to provide for the safety of officers and to protect the Department against fraudulent claims of lost, stolen or damaged property"). The Court therefore rejects Pineda's argument that there was no basis for conducting the inventory search. (ECF No. 31 at 9.) The government has adequately shown that the tow and inventory search were warranted under the circumstances.

To the extent Pineda argues that the gun was a product or "fruit" of his illegal detention, the Court rejects this argument. (*Id*. at 6-9.) *See Pulliam,* 405 F.3d at 787. Discovery of the gun was wholly independent and separate from Pineda's detention; the record and Trooper Koester's testimony clearly show that the gun's discovery would have occurred regardless of Pineda's detention. *See id.* at 787, 790 (to demonstrate that the evidence found in a car was the fruit of his own unlawful detention, the passenger must

---

[9]Pineda does not dispute the characterization of the search as an inventory search. (ECF Nos. 31; 45.)

[10]Trooper Koester testified that he conducted two license plate checks on the Jeep. He ran a first check before the stop, when he was still following the vehicle, and the result came back as "no match." (ECF Nos. 39-3 at 2; 54.) He then conducted a second license plate check a few minutes into the stop and was informed by dispatch that the Jeep's plates belonged to a 2001 Honda Accord. (ECF Nos. 31-1 at 10; 41-3 at 9:57:19-9:58:00; 54.)

show that "but for the detention, the evidence in the car would not have been found"). (ECF Nos. 31-1 at 11-12; 39-9 at 2; 54.) The car had fictitious plates, was registered to a third party, and could not be released to Pineda; the driver of the vehicle could not provide the troopers with any documentation that she was in lawful possession of the vehicle. (ECF Nos. 31-1 at 10; 39-9 at 2; 54.) Because the vehicle would be coming under the control of the Department, the troopers had to inventory the property inside the vehicle to protect the vehicle's owner and to protect the Department from liability, during which time they found the gun. *See* DPS Policy 503.4.2(a); 503.5.4. Pineda did not make any statements during his detention that prompted the officers to search the car—the gun was found *before* his interrogation.[11] (ECF Nos. 41-3 at 10:43:39; 41-6 at 10:29:53.) *See Pulliam*, 405 F.3d at 787. Hence, the gun was not a "fruit" of Pineda's unlawful detention because Pineda failed to show that but for his detention, the gun would not have been found. *See id*.

To the extent Pineda argues that the gun was the product of an unlawful inventory search, the Court rejects this argument as well. (ECF No. 31 at 9-10.) Defense counsel does not argue, nor does the record suggest, that the inventory search was pretextual or a ruse to discover incriminating evidence.[12] (ECF Nos. 31; 45.) *See U.S. v. Johnson*, 889 F.3d 1120, 1125-26 (9th Cir. 2018) ("The purpose of the [inventory] search must be non-investigative; it must be conducted on the basis of something *other* than suspicion of evidence of criminal activity") (citation and quotation marks omitted); *U.S. v. Garay*, 938

---

[11]In *Pulliam*, the U.S. Supreme Court presented several ways a passenger can show that the evidence found in a car was the fruit of his own unlawful detention. *See* 405 F.3d at 787. For instance, the passenger could "show that had he requested to leave the scene of the traffic stop, he would have been able to do so in [the] car." *Id*. (citation omitted). "Or, he could show that statements he made or evidence found on his person during his detention prompted the officers to search the car or enabled them to find evidence in it that otherwise would have remained hidden." *Id*. (citation omitted). "In each of these nonexclusive examples, it can be argued that but for the detention, the evidence in the car would not have been found." *Id*.

[12]The defendant has the burden of demonstrating that the inventory search was unreasonably pretextual. *See Johnson*, 889 F.3d at 1126.

F.3d 1108, 1111 (9th Cir. 2019) ("Inventory searches are consistent with the Fourth Amendment only if they are not used as an excuse to rummage for evidence") (citation omitted). As discussed above, law enforcement had valid reasons to inventory the property inside the Jeep and the troopers complied with DPS policies in conducting the inventory search. (ECF Nos. 31-1 at 10; 39-9 at 2; 54.) *See* DPS Policy 503.4.2(a); 503.5.4. Moreover, as a passenger of the car, Pineda does not have standing to directly challenge the inventory search. *See Pulliam*, 405 F.3d at 786.

In sum, because Trooper Koester had reasonable suspicion to stop the vehicle, because the gun was the product of a valid traffic stop, because discovery of the gun was wholly separate and independent from Pineda's detention, and because Pineda does not have standing to directly challenge the inventory search, the Court denies the Motion as it relates to suppression of the gun.

### C.   Suppression of the Incriminating Statements

The Court will next address suppression of Pineda's incriminating statements, where he admitted that the gun was his and that he had modified the firearm. (ECF Nos. 41-3 at 10:44:17; 54.) Pineda argues that the aggressive tactics used by the troopers immediately converted Pineda's seizure into an arrest without probable cause, so the incriminating statements were obtained in violation of the Fourth Amendment. (ECF No. 31 at 6-8.) The government counters, in part, that Trooper Koester had reasonable suspicion to conduct an investigatory stop and detention, Trooper Koester's use of force did not convert the investigatory stop into an arrest, and even if there was an unlawful arrest, the parole warrant broke the chain of causation. (ECF No. 39 at 10-22.) The Court agrees with the government.

### 1. Intrusive Law Enforcement Tactics

The Court will first evaluate whether the troopers' use of force immediately converted the stop into an arrest. As explained above, Trooper Koester had reasonable suspicion to make the initial stop, based on his suspicion that the car had fictitious plates and based on his good-faith reliance on dispatch's report that the vehicle was stolen and

had fled from RPD. (ECF Nos. 39-3 at 2; 54.) However, when the Jeep abruptly pulled into the parking lot, Trooper Koester implemented more intrusive tactics, which included activating his lights and sirens, drawing his service pistol and holding Pineda at gun point until backup arrived, telling Pineda to put his hands up and get on his knees, and placing Pineda in handcuffs and in the back of the patrol car. (ECF Nos. 31 at 6-8; 41-3 at 9:56:27-9:57:07; 54.) Although a close call,[13] the Court finds that Trooper Koester's intrusive tactics were justified under the totality of the circumstances for reasons of personal safety and did not convert the investigatory stop/detention into an arrest.

A lawful traffic stop must be limited in scope and "may last no longer than is necessary to effectuate [its] purposes and complete the traffic mission safely." *Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023) (citations and quotation marks omitted). "[A]n officer may address the traffic violation that warranted the stop, make ordinary inquiries incident to the traffic stop, and attend to related safety concerns." *Id.* (citation and quotation marks omitted). When evaluating whether an investigatory stop was converted into an arrest, the Court must consider the totality of the circumstances, including "the aggressiveness of the police methods and how much the [individual's] liberty was restricted[,]" and "the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (citations omitted); *see also U.S. v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014) (citation omitted).

The Ninth Circuit has "only allowed the use of especially intrusive means of effecting a stop in special circumstances, such as 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that

---

[13]Even if the stop was converted into an arrest without probable cause, the Court finds that the attenuation doctrine applies, as discussed below, and Pineda's incriminating statements would still be admissible.

may involve violence is about to occur." *Id*. at 1189 (citation omitted). "The number of police officers present is also highly relevant." *Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1047 (9th Cir. 2014) (citation omitted). "While these considerations are not exhaustive, they all inform the ultimate inquiry of whether the officers' conduct was a reasonable response to legitimate safety concerns on the part of the investigating officers." *Id*. (citation and quotation marks omitted); *see also Washington*, 98 F.3d at 1185 ("The relevant inquiry is always one of reasonableness under the circumstances") (citations omitted).

When viewed under the totality of the circumstances, Trooper Koester's actions did not convert the investigatory stop into an arrest because he feared for his personal safety. *See Washington*, 98 F.3d at 1185 (citations omitted). Although the drawing of guns and handcuffing a defendant increase the seriousness and intrusiveness of a stop, the "use of force during a stop does not convert the stop into an arrest if it occurs under circumstances justifying fears for personal safety." *See U.S. v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982); *U.S. v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987) (citation omitted); *Washington*, 98 F.3d at 1188. While some factors support a finding of an arrest—Pineda was cooperative with troopers, there was no indication Pineda was armed, and his liberty was restricted—the specific circumstances of the case weigh against such a finding. Pineda's abrupt exit from the vehicle and his movement towards Trooper Koester raised safety concerns,[14] particularly given dispatch's report that the Jeep was stolen and had fled from RPD during an earlier stop. *See Washington*, 98 F.3d

---

[14]At the Hearing, the government argues that Trooper Koester's intrusive tactics were justified because he feared that Pineda would flee from the scene. (ECF No. 54.) The Court rejects this argument because Trooper Koester explicitly testified that he implemented more intrusive tactics due to safety concerns—not flight. (*Id*.) Moreover, although the bodycam footage appears to show Pineda's movement towards the rear of the vehicle after exiting the car, it does not show that he tried to flee the scene, and the Jeep was parked and cabined among other occupied parking spaces. (ECF No. 41-3.) The government may not change the facts of the case to fit their argument when the narrative is not supported by the record or law enforcement testimony. (ECF Nos. 41-3; 54.)

at 1185, 1188-89 (citation omitted); *see also Edwards*, 761 F.3d at 981 (citation omitted). Trooper Koester was also reasonably complying with NHP protocol for a high-risk felony stop, which required all occupants of the vehicle to be taken out at gun point and required him to clear the vehicle. (ECF No. 54.)

Moreover, the ultimate inquiry for a Fourth Amendment challenge is whether the officers' conduct was a *reasonable* response to legitimate safety concerns. *See Green*, 751 F.3d at 1047 (citation and quotation marks omitted); *see also Heien v. N. Carolina*, 574 U.S. 54, 60 (2014) ("[W]e have repeatedly affirmed, the ultimate touchstone of the Fourth Amendment is reasonableness") (citation and quotation marks omitted). Trooper Koester's tactics, albeit intrusive, were *reasonable* under the specific circumstances of this case. Trooper Koester testified that he did not initiate a traffic stop until the Jeep turned into the Mor Furniture parking lot because he thought the vehicle was stolen and had information that RPD was recently in pursuit of the vehicle and wanted to wait for back-up. (ECF No. 54.) He was the only officer on the scene and was conducting a stop on a reportedly stolen car with an unknown number of occupants and fictitious plates, which had allegedly fled from RPD officers. (ECF Nos. 39-3 at 2; 41-3 at 9:56:27-9:57:07; 54.) *See Green*, 751 F.3d at 1047. Trooper Koester's existing fear for his safety was further exacerbated when the passenger of the "stolen" vehicle abruptly exited the car and appeared to be moving towards him. (ECF Nos. 41-3 at 9:56:04, 10:02:00; 54.)

There was also a large Pit bull in the car, with its head hanging out of a fully rolled down window, and Pineda repeatedly warned officers that the dog might jump out or run out of the window. (ECF Nos. 41-7 at 5:58; 41-3 at 9:56:04, 10:01:13, 10:02:00, 10:06:30-10:06:37, 10:13:52.) When viewed under the totality of the circumstances, Trooper Koester's decision to implement more aggressive tactics to secure the scene, clear the vehicle, and protect his personal safety, did not convert the stop into an arrest. *See Green*, 751 F.3d at 1047 (citation omitted); *Heien*, 574 U.S. at 60-61 ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of

1   government officials, giving them fair leeway for enforcing the law in the community's

2   protection") (citation and quotation marks omitted).

3                          **2. Prolongation of the Stop**

4          Next, the Court is unpersuaded by Pineda's argument that Trooper Koester

5   unreasonably and unlawfully prolonged Pineda's detention, particularly after dispatch

6   informed him that the Jeep may not have been stolen. (ECF Nos. 31 at 8-9; 41-3 at

7   10:04:34; 54.) The government counters, in part, that the stop and detention were validly

8   prolonged because the troopers could not access the Jeep's VIN number to verify

9   whether the car was stolen. (ECF Nos. 39 at 18; 54.) The Court agrees with the

10  government.

11         A stop "may last no longer than is necessary to effectuate [its] purposes and

12  complete the traffic mission safely." *Taylor*, 60 F4th at 1239 (citations and quotation marks

13  omitted). An officer may only prolong a stop if "it was (1) part of the stop's 'mission' or (2)

14  supported by independent reasonable suspicion." *U.S. v. Landeros*, 913 F.3d 862, 867-

15  68 (9th Cir. 2019) (citation omitted); *see also Taylor*, 60 F.4th at 1239 (explaining that a

16  stop "may be extended to conduct an investigation into matters other than the original

17  traffic violation so long as the officers have reasonable suspicion of an independent

18  offense") (citation and quotation marks omitted). When detaining a driver after a traffic

19  stop, "any questioning must relate to the purpose of the stop," and "the detention must be

20  temporary and unintrusive." *Rojas-Millan*, 234 F.3d at 469-70 (citations omitted).

21         The Court finds that Trooper Koester was permitted to prolong the stop and

22  Pineda's detention, and the prolongation did not convert the stop into an arrest because

23  Trooper Koester was acting within the "mission" of the traffic stop and his actions were

24  necessary to effectuate the purposes of the stop. *See Landeros*, 913 F.3d 867-68 (citation

25  omitted); *Taylor*, 60 F4th at 1239 (citations and quotation marks omitted). Trooper Koester

26  was investigating whether the Jeep was stolen, whether the car had fled from RPD during

27  a prior stop, and whether the car had fictitious plates. (ECF Nos. 39-2; 39-3; 54.) Dispatch

28  informed Trooper Koester, around nine minutes into the stop, that RPD was now saying

the only charge they had was the fictitious plates. (ECF Nos. 41-3 at 10:04:34; 54.) Trooper Koester testified that he did not terminate Pineda's detention at that point because he was receiving conflicting information—first the car was stolen, now it might not be stolen; RPD refused to come to the scene despite Trooper Koester's request; a second license plate check confirmed that the car's plates were fictitious and fictitious plates could be an indicator of a stolen car[15]; the troopers could not access the Jeep's VIN due to the growling Pit bull; and Trooper Stuke told Trooper Koester that he saw three RPD cars "all over" pursuing the Jeep, with their sirens on. (ECF Nos. 31-1 at 10; 43-1 at 10:04:34-10:04:59, 10:05:08, 10:11:25-10:11:38, 10:14:17-10:14:44; 41-6 at 10:04:44; 54.) Given this conflicting information, prolongation of the traffic stop and detention were necessary to verify whether the vehicle was actually stolen.

The bodycam footage and audio also support this continuing lack of clarity. (ECF Nos. 41-3 at 10:04:59; 54.) The dispatcher did not explicitly state that the vehicle was not stolen, the dispatcher instead stated that the only charge RPD had was the fictitious plates. (ECF No. 41-3 at 10:04:34.) Trooper Koester also told another officer that although he was originally told the Jeep was stolen, "I *don't know* if that's the case, fictitious plates on it for sure, but can't get the VIN just yet because the dog is growling." (*Id.* at 10:04:59 (emphasis added).) Accordingly, it was reasonable for Trooper Koester to continue investigating, as part of the mission of the traffic stop, to determine whether the Jeep was stolen. *See Landeros*, 913 F.3d at 867-68 (citation omitted). Alternatively, the dispatcher's confirmation[16] that the Jeep's license plates belonged to a Honda Accord also serves as independent reasonable suspicion to prolong the stop because, as Trooper Koester

---

[15]Trooper Koester testified at the Hearing that fictitious plates could be an indicator that a car is stolen. (ECF No. 54.)

[16]The Court notes that Trooper Koester appeared to have receive this confirmation about the fictitious license plates before he learned that the vehicle may not have been stolen. (ECF Nos. 31-1 at 10; 41-3 at 10:04:34.)

testified, fictitious plates may be an indicator that a vehicle is stolen. (ECF Nos. 31-1 at 10; 54.)

Finally, in order to properly effectuate the purpose of the stop, the troopers needed to access the Jeep's VIN number to verify registration. *See Taylor*, 60 F4th at 1239 (citations and quotation marks omitted). However, access was hindered and delayed because the Pit bull inside the car growled at Trooper Stuke when he tried to approach the vehicle; for safety reasons,[17] the troopers had to wait until animal control arrived to remove the dog. (ECF Nos. 41-3 at 10:05:08; 41-6 at 10:04:44.) Thus, the troopers' actions were part of their "mission" to investigate whether the vehicle was stolen, the "mission" was prolonged because of the Pit bull inside the car and because Trooper Koester was receiving conflicting information, and the traffic "mission" was not completed until the troopers were finally able to access the VIN and confirm that the car was not stolen. *See Landeros*, 913 F.3d at 867-68 (citation omitted).

### 3. Attenuation

The government argues that even if Pineda's seizure was an illegal arrest without probable cause, Trooper Koester's discovery of Pineda's parole warrant constituted an intervening event, which attenuated any Fourth Amendment violations. (ECF No. 39 at 20-22.) The Court agrees.

"Where evidence is obtained from an unlawful search or seizure, the exclusionary rule renders inadmissible both primary evidence obtained as a direct result of an illegal search or seizure and evidence later discovered and found to be derivative of an illegality, known as fruit of the poisonous tree." *U.S. v. Baker*, 58 F.4th 1109, 1119 (9th Cir. 2023) (citations and quotation marks omitted). An exception to the exclusionary rule is the attenuation doctrine, where evidence "is admissible when the connection between

---

[17]The troopers' precautions appeared to be supported by Pineda's own warnings, where he repeatedly stated that his dog was afraid of uniforms and guns because the mailman tried to attack him; that the dog might jump out or run out of the car because he was "kind of dumb"; and that he was concerned his dog would be accidentally shot. (ECF Nos. 41-3 at 10:01:13, 10:06:30-10:06:37, 10:13:52; 41-7 at 5:58.)

1   unconstitutional police conduct and the evidence is remote or has been interrupted by

2   some intervening circumstance, so that the interest protected by the constitutional

3   guarantee that has been violated would not be served by suppression of the evidence

4   obtained." *Id*. (citations and quotation marks omitted); *see also U.S. v. Garcia*, 974 F.3d

5   1071, 1076 (9th Cir. 2020) (explaining that attenuation applies when "the connection

6   between the illegality and the challenged evidence has become so attenuated as to

7   dissipate the taint caused by the illegality") (citations and quotation marks omitted).

8        Courts consider three factors when determining whether to apply the attenuation

9   doctrine: 1) the temporal proximity between the conduct and the discovery of the

10  evidence, 2) the presence of intervening circumstances, and 3) the purpose and flagrancy

11  of the official misconduct. *See Baker,* 58 F.4th at 1119-20 (citing *Brown v. Illinois*, 422

12  U.S. 590, 603-04 (1975)).

13       Here, Trooper Koester discovered Pineda's active parole warrant during his

14  detention—around twelve minutes into the stop. (ECF No. 41-3 at 9:55:48, 10:07:57.)

15  While the troopers were waiting for animal control to arrive, Trooper Koester asked for

16  Pineda's identification, which Pineda immediately provided.[18] (*Id*. at 10:05:49-10:06:26.)

17  _____

18       [18]Although this issue was not explicitly raised by the parties, the Court finds that
Trooper Koester was permitted to obtain Pineda's identity because it was part of the
19  mission of the traffic stop. Trooper Koester stopped the vehicle based on his reasonable
suspicion that the vehicle was stolen, had fled from RPD during an earlier stop, and had
20  fictitious plates. (ECF Nos. 39-3 at 2; 54.) Accordingly, the "mission" of the stop was not
limited to just the driver but also extended to the passenger because Trooper Koester
21  had to determine who the vehicle belonged to, who the vehicle's registered owner was,
and whether it can be released to Pineda if the driver is arrested. (ECF No. 54.) To make
22  those determinations, Trooper Koester was permitted to inquire into Pineda's identity,
even though he was a passenger. *See U.S. v. Jay*, Case No. 4:20-cr-00195-BLW, 2021
23  WL 2635843, at *7 (D. Idaho June 24, 2021) (finding that because "the officer stopped
the vehicle based on reasonable suspicion that the driver had engaged in an arrestable
24  offense[,]" "the mission of the stop extended to determining whether the vehicle could be
turned over to the passenger . . . in the event that the officer arrested the driver" and the
25  officer was allowed to inquire into the identity of the passenger) (citation omitted).

26       The present case is distinct from *U.S. v. Landeros*, where the Ninth Circuit held
that a passenger's identification is usually not within the mission of a traffic stop. *See* 913
27  F.3d 862, 868 (9th Cir. 2019). Unlike in *Landeros*, Trooper Koester did not intentionally

28

Pineda also volunteered that he was on parole and gave Trooper Koester the name of his parole officer in Nevada. (*Id*.) Trooper Koester then asked dispatch to check if there were any warrants for Pineda and dispatch informed him that Pineda had a DONS Priority 5 parole warrant. (ECF Nos. 31-1 at 11; 41-3 at 10:07:03-10:07:57.) Pineda was arrested for the warrant and during his interrogation[19] for the parole warrant, Pineda admitted that the gun inside the car was his. (ECF No. 41-3 at 10:43:23- 10:44:17.) When weighing the three *Brown* factors, the Court finds that discovery of the active probation warrant was an intervening event that attenuated the unlawful arrest.

As to the first *Brown* factor, the parties agree that the temporal proximity between the alleged illegal arrest and Pineda's incriminating statements weighs against attenuation. (ECF Nos. 39 at 21; 41-3 at 10:43:52; 45 at 8.) *See Brown*, 422 U.S. at 603-04. As to the second *Brown* factor, the Court finds that Trooper Koester's discovery of the active warrant was an intervening event that broke the causal chain between the unlawful arrest and Pineda's incriminating statements. (ECF No. 41-3 at 10:07:57.) *See id*. In *Utah v. Strieff*, the U.S. Supreme Court found that "the valid arrest warrant—one that predated and was 'entirely unconnected' to the illegal stop—constituted an intervening circumstance that favored a finding of attenuation." *Baker*, 58 F.4th at 1120 (citing *Utah*

---

[19]prolong the stop because Pineda refused to provide his identification—Pineda immediately complied with Trooper Koester's request, even volunteering that he was on parole; the stop was only prolonged due to the troopers' inability to access the VIN because of the Pit bull inside the car. (ECF No. 41-3 at 10:05:49-10:06:26.) *See id*. at 870. Moreover, the officer in *Landeros* only pulled over the car for speeding, but Trooper Koester had reasonable suspicion that the driver had committed an arrestable offense and was trying to determine who the vehicle belonged to, whether the vehicle was stolen, and whether the car could be released to Pineda. (ECF No. 54.) *See Landeros*, 913 F.3d at 864; *Jay*, 2021 WL 2635843, at *5. Thus, Trooper Koester's inquiry into Pineda's identity was permissible.

[19]Before the interrogation, Trooper Koester gave Pineda his *Miranda* warnings and Pineda indicated that he understood his rights. (ECF Nos. 41-3 at 10:43:23-10:44:17; 54.) The Court notes that Pineda is not challenging the sufficiency of the *Miranda* warnings or alleging any constitutional violations and misconduct during the interrogation itself. (ECF Nos. 31; 45; 54.)

*v. Strieff*, 579 U.S. 232, 240 (2016)). "The Court reasoned that the arrest warrant obligated the officer to arrest the defendant and the arrest itself established the officer's authority to search the defendant's person." *Id*. (citing *Strieff*, 579 U.S. at 240-41). Similarly, here, Pineda's DONS Priority 5 parole warrant predated the stop and arrest—Pineda's parole officer issued the priority hold on December 20, 2021—approximately a month and a half *before* the stop. *See Strieff*, 579 at 240. (ECF No. 54.) The warrant was also entirely unconnected to the stop—it pertained to Pineda's parole violations[20] for an unrelated second-degree murder case. (ECF Nos. 31-1 at 11; 54.) *See id*. Thus, the arrest for the parole warrant established Trooper Koester's authority to interrogate Pineda. *See Baker*, 58 F.4th at 1120.

Moreover, the unique nature of a warrant supports a finding of attenuation. *See Garcia*, 974 F.3d at 1076. In *Strieff*, the Supreme Court reasoned that the warrant was unconnected to the illegal stop because an officer has "a sworn duty to carry out [a warrant's] provisions" and an obligation to make the arrest. *See* 579 at 240 (citation omitted). Trooper Koester's arrest of Pineda was essentially "a ministerial act that was *independently* compelled by the pre-existing warrant" and not influenced by any prior illegal conduct, thus dissipating the taint caused by the illegality. *See id*. (emphasis added); *Garcia*, 974 F.3d at 1076. Trooper Koester and Pineda's parole officer, C. Congdon, both testified that a DONS Priority 5 warrant *requires* an officer to immediately arrest the parole absconder. (ECF No. 54.) Thus, the second *Brown* factor favors attenuation.

Finally, the third *Brown* factor also favors attenuation. *See Brown*, 422 U.S. at 603-04. To the extent Pineda's arrest was unlawful, it was the result of Trooper Koester's good-faith error rather than his purposeful and flagrant misconduct. *See id*.; *see also Strieff*, 579 U.S. at 242. As explained above, Trooper Koester reasonably relied on a partially inaccurate dispatch report, which conveyed that the vehicle was stolen, had fled

---

[20]Pineda's probation officer, C. Congdon, testified that she issued the parole warrant because Pineda failed to check in with probation for many months. (ECF No. 54.)

from RPD officers during an earlier stop, and had fictitious plates. (ECF Nos. 39-3 at 2; 54.) Thus, his actions were consistent with and in compliance with NHP protocol for a high-risk felony stop. (ECF No. 54.) *See Strieff*, 579 U.S. at 242 (finding that the third *Brown* factor favored the government because "all the evidence suggests that the stop was an isolated instance of negligence"). There is no evidence that Trooper Koester's unlawful conduct was part of any systemic or recurrent law enforcement misconduct. *See id*. at 241-42.

Because the second and third *Brown* factors strongly favor attenuation, the Court finds that Pineda's incriminating statements are admissible. The parole warrant was an intervening event, independent of the illegal arrest, that attenuated any unlawful law enforcement conduct. Pineda's Motion is therefore denied.

**IV.    CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of Pineda's Motion.

It is therefore ordered that Pineda's motion to suppress (ECF No. 31) is denied.

DATED THIS 4th Day of May 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE